The pleadings in this case present a question of much importance, which has not been hitherto directly decided in this State, nor, so far as I have been able to ascertain, in any other State of the Union. The charter, by which the plaintiffs exist as a corporation, after conferring upon it the usual powers for the acquisition of estates both real and personal, declares in the tenth section, "that the whole amount of real and personal estate belonging to the said corporation shall not, at any one time, exceed the sum of two hundred thousand dollars." (See Act of 1838, ch. 13). It is admitted that the amount of the personal estate claimed by the plaintiffs, under the will of the testator, Maxwell Chambers, will, when added to the value of the property which they already possess, greatly exceed the sum mentioned in their charter; but their counsel contend, that notwithstanding the restrictive clause in their charter, the plaintiffs are entitled to receive the excess, subject to the right of the State to take it from them. A claim is set up on behalf of the defendant Caldwell, upon the ground, that the restriction in the charter of the plaintiffs made the excess of the legacy to them unlawful, and therefore void, in consequence of which, it results to him as the representative of the next of kin. The executors admit that they have the fund in their hands, and express their readiness to pay it over to whomsoever the Court may declare that it ought to be paid. The question is thus fairly raised between the plaintiffs and the next of kin of the testator, and it becomes the duty of the Court to decide it according to the established principles of equity.
In the very able arguments made for the plaintiffs, the counsel have urged their claim upon two grounds: First, its analogy to the acquisition of land by an alien; and, secondly, its *Page 261 
analogy to the principle upon which the statutes of mortmain in England were construed. I will proceed to consider them both, and will commence with that of the alien.
It is a well-settled rule of law in England, and in this State as well as in most, if not all, of the other States of the Union, that an alien may acquire lands by purchase, and may hold them against all persons except the King, or the State; but upon office found, the King in England, or the State in this country, may seize and have them. Co. Lit. 2; 1 Black. Com. 372. Different reasons have been given for the rule. Mr. Justice BLACKSTONE, on the page above cited, says that "if an alien could acquire a permanent property in lands, he must owe an allegiance, equally permanent with that property, to the King of England, which would probably be inconsistent with that which he owes to his own natural liege-lord; besides, that, thereby, the nation might in time be subject to foreign influence, and feel many other inconveniences. Wherefore, by the civil law, such contracts were also made void; but the prince had no such advantage of forfeiture thereby, as with us in England. Among other reasons which might be given for our constitution, it seems to be intended by way of punishment for the alien's presumption in attempting to acquire any landed property." One of the editors in his note (8) on this page remarks that "a political reason may be given for this, stronger than any here adduced. If aliens were admitted to purchase and hold lands in this country, it might at any time be in the power of a foreign State to raise a powerful party amongst us; for power is ever the concomitant of property." He illustrates his position by referring to the course pursued by the Czarina of Russia to raise up a party and acquire an influence in Poland whereby she was enabled to dismember that devoted and unhappy Kingdom.
In the case of Governeur v. Roberston, 11 Wheat. Rep. 332, Mr. Justice JOHNSTON, in delivering the opinion of the Court, speaks of the rule as having been so long and so firmly established in the common law, that an enquiry into the foundation of it was a mere matter of antiquarian curiosity, and he then *Page 262 
seems to approve what he had seen in an elementary writer, as the reason why the sovereign could not seize the lands until an office was found, to wit, "that every person is supposed a natural born subject, that is resident in the Kingdom, and that owes allegiance to the King, till the contrary be found by office." There can be no doubt, then, of the rule of law, whatever may be the reason for it, that an alien may acquire by purchase, land or any other species of real estate, and may hold it against all persons except the King or State; and may hold even against the sovereign, until he may choose to have an office found, and process thereupon to have it seized into his hands. Among the modes of acquisition in England and in this State, is that by devise, or disposition contained in a man's last will. Hence, in England, and perhaps in this State, an alien might take real property by devise, which would give him a good title to it, as against all persons but the sovereign. In analogy to this, the counsel for the plaintiffs have contended that their clients have the right to take the whole legacy bequeathed to them by Mr. Chambers, though it may be that by force of the restrictive clause in their charter, the State might, if it saw fit, take from them the excess over the value of the property which they were authorized to own. The argument would have much force — perhaps be irresistable [irresistible] — if the legacy vested at once and immediately, under the will, in the plaintiffs. Such is the case undoubtedly in a devise of land. The devisee takes it at once by force of the will, and his title becomes complete immediately upon the death of the devisor. But the case of a legacy is well known to be different. Upon the testator's death, all his personal property becomes vested in the executor, who holds it in trust, first, for the payment of the funeral expenses, charges of administration and debts, and then for the payment of legacies; and if there be a residue undisposed of by the will, he is bound, since the act of 1789, (see 1 Rev. Stat. ch. 46, sec. 18; Rev. Code, ch. 46, sec. 24), to pay it over to the next of kin. The legatee has no legal title to the legacy until the executor shall give his assent to it. So strong is this rule, that if a legatee take into possession a specific chattel, *Page 263 
given to him by the will, without the consent of the executor, the latter may by a suit at law recover it back; 2 Williams on Ex'rs., 845. It is true, that if, after the payment of all the debts and other legal charges upon the estate, the executor withholds his assent to a legacy, the legatee may, by a bill in equity, compel him to assent to it, and thereby give him a title to it; but it is by means of a suit in equity alone that he can get possession of a legacy, either general or specific, from an obstinate or dilatory executor. It needs the aid of a court, then, to enable the plaintiffs to recover the legacy which they claim; and the analogy to the case of an alien cannot be of much avail to them, unless we find that the law will per se and proprio vigore cast an estate upon him, or that a court either of law or equity, will lend him its assistance to obtain it. Let us see how that is. It is very certain that an alien cannot take lands by descent, or as a tenant by the curtesy, or tenant in dower, or other title derived merely from the law. Co. Litt. 8; 2 Black. Com. 249; 7 Rep. 25;Paul v. Ward, 4 Dev. 247; Copeland v. Sauls, 1 Jones' Rep. 70; Bell on the property of Husband and Wife, 151, (67 Law Lib. 114). It remains to be enquired whether the courts will aid him in his endeavor to obtain it. In making this investigation, we find it stated in the older authorities of the law, that an alien cannot maintain a real or mixed action. There was some difference as to the manner in which the defence was to be availed of by plea, when the alien was one of a country in league, and when he was an enemy. See Litt. sec. 198; Co. Litt. 129; Brooke, title Denizen, 3, 10; Roscoe on Real Actions, 197. Some learned Judges thought this doctrine to be at variance with the principle that an alien in possession of lands could hold them against all persons but the sovereign, and might maintain actions of trespass against wrongdoers. In the case of Rouche v.Williamson, 3 Ire. Rep. 141, this Court suggested the following explanation: "It has occurred to us, that perhaps the doctrine may be thus accounted for and explained. In real and in mixed actions strictly so called, the demandant seeks to obtain, by means of the law, the seizin of a parcel of *Page 264 
land or a tenement, whereof he has never had seizin, or of the seizin whereof he has been unlawfully deprived. Now, as the law will not aid aliens to get land, because by such means the realm may be impoverished,(The King v. Holland, Allen, 14), it will withhold its aid to restore, or to give him seizin, though, while he remains seized, it will protect him against wrongdoers. It may be, also, that while the alien is seized, the law regards him as holding for the use of the sovereign, (1 Inst. 186, a), but the law deems him an improper person to take such seizin for the King, without the King's license." It is true that the Court held that the alien might maintain ejectment; but they put the decision expressly upon the ground, that as against the tenant in possession, the lessor had the right to the possession of the land, of which such tenant had unjustly deprived him. "Upon the trial of an ejectment under the common rule, and on the plea of not guilty, (say they), nothing is in dispute but the right of the plaintiff's lessor to demise the land, whereof the defendant is in possession. The plaintiff is entitled to a verdict upon showing that at the date of the confessed demise, his lessor had a legal title to the possession of the premises. And this legal title to the possession must belong to him who is recognized by the law as having the estate in the premises." It is manifest from what has been shown above, that the plaintiffs' lessor's right of possession must have been previously acquired by his own act, and had not been cast upon him by descent, curtesy, dower, or any other title derived merely from the law. It is equally clear that the spirit of the old law was to forbid its courts from lending their aid to an alien when seeking to acquire, or regain, a seizin of lands or other real property.
The case of Atkins v. Kron, reported in 2 Ire. Eq. 58, and 5 Ire. Eq. 207, will afford a more apposite and instructive analogy. It was a case of a bill filed by an executor against the legatees and devisees of his testator, and also against the Trustees of the University, for the purpose of obtaining the advice and direction of the Court as to the proper construction of the will of his testator, and his duties arising therefrom. So *Page 265 
far as is necessary for my purpose, the provisions of the will are these: After giving a number of pecuniary legacies, the testator adds, "I give the balance or residue of my property to my executor, in trust, for the benefit of my sister Quenet's grand-children by the name of Forestier, to be paid to any one of them who shall apply for the same, subject, however, to the payment of the legacies made in this will," c. "But should no one of my sister Quenet's grand-children, nor any one duly authorised to receive the above property in their behalf, apply within two years from the time of my decease, then the above property to revert unto Mary C. Kron's children, and be distributed equally amongst them, subject, however, to the legacies herein mentioned." One of the questions, and the only one necessary to be here noticed, was, whether the trust in the real estate included in the residue, for the testator's sister Quenet's grand-children, who were aliens, was valid and could be enforced in Equity. It was held, according to the report in 2 Ire. Eq. 58, that the devise in trust for the aliens was void, and that the limitation over to Mrs. Kron's children was good, and a decretal order was made in their favor. A petition to rehear that part of the decree was filed on behalf of the aliens, and the question was thereupon very fully and elaborately argued by counsel on both sides. The Court, in a very able opinion, delivered by RUFFIN, Chief Justice, in which all the arguments and authorities upon the subject are reviewed, affirmed the former decree, concluding thus: "The Court, then, looks upon the disability of an alien to hold as cestui que trust of land, as placed, beyond all question, upon both principle and authority. When, therefore, the testator's trustee and executor asked, whether he ought to execute the trust, in respect of the real estate in favor of the aliens, the Court was obliged to declare, that he ought not, and that against them the sovereign was entitled. Whether the State should in this particular instance take, as between it and the children of Mrs. Kron, the devisees substituted for the aliens, was another question, with which the aliens had, and yet have, nothing to do, and which *Page 266 
is not now open for discussion. But as to the exclusion of the aliens, no one of the Court doubted, when the decree was made; and upon a rehearing, no one of the Court now doubts." (See 5 Ire. Eq. at p. 216). Here, then, was a case in which the aliens might have taken under a direct devise of the legal estate to them, subject to the right of the sovereign to seize it upon office found, but in which, as a trust, the Court of Equity refused its aid to have it executed in favor of the aliens at all. If, therefore, it were unlawful for the plaintiffs, in the case before us, to hold the legacy as against the State, it seems to me that the analogy furnished by the case of an alien taking and holding land against every person but the sovereign, is against, instead of being in favor of, the claim of the plaintiffs to have it paid to them.
I will now consider the argument of the counsel for the plaintiffs, founded upon the analogy supposed to be afforded by the construction of the English statutes of Mortmain. In the outset I will remark, that a person, at first view, would hardly expect to find any thing in the English law of Mortmain, to throw much light upon the question of the right to a legacy in this State. The statutes of Mortmain never did embrace personal property even in England, (Shelf. on Mort. 9; Ang. and Ames on Corp. sec. 148,) and have never been adopted by any State of the Union, except Pennsylvania; Ang. and Ames on Corp. sec. 149; 2 Kent's Com. page 283. In England, the statutes were designed to prevent the accumulation of the landed property of the kingdom in the dead hands of the corporations, particularly the religious houses, whereby "it was observed that the feudal services, ordained for the defence of the kingdom, were every day visibly withdrawn; that the circulation of landed property from man to man began to stagnate; and that the lords were curtailed of the fruits of their seigniories, their escheats, wardships, reliefs and the like." 2 Black. Com. 270. They were enacted from time to time, commencing with the great charter of Henry the 3rd, in the 9th year of his reign, and coming down to the stat. of 9th Geo. 2nd. It is not my intention *Page 267 
to give a history of them, either in detail or otherwise. An excellent summary of them, with their various provisions, and the construction put upon them, may be found in 2 Black. Com. from p. 270 to 275. In Shelford on Mortmain, (36 and 37 vols. of the Law Lib.) they will be found to be stated more at large, and treated of more fully. See also 2 Inst. 74, for a commentary upon such of them as were passed prior to the time of Lord COKE. Upon an examination of all of them, except that of 9th George 2nd, it will be seen that they did not make void the purchase of lands by the corporations, but declared that if it was made without licenses from the king, and the lords of whom the lands were holden, the lands should be forfeited, and the lord, or king, as the case might be, should have the right to enter for the forfeiture, and seize the lands for his own use. It will be seen further, that the king could not enter until office found; Shelf. on Mort. 10, citing Hayne v. Redfern, 12 East. Rep. 96; Evans v.Evans, 5 Barn. and Cres. 587, note (e); S.C. 8 Dowl. and Ryl. 399. The statute of 9 George 2, ch. 36, was intended to apply to conveyances and devises of lands, or any interest in them made to individual trustees, as well as to bodies politic, for charitable purposes, and it declared all such as were not executed as therein prescribed, to be void. Under this statute, then, all the forbidden conveyances and devises were construed to be void, and in the case of a devise, the heir-at-law was held to be entitled to the land. Shelf. on Mort. 204.
I have hereinbefore referred to the opinion of Chancellor KENT, that none of these statutes of Mortmain had been adopted in any State of the Union except Pennsylvania. I think I may safely assert that not one of them has ever been in force in North Carolina. I do not find in our reports any trace of their existence here. It is true, that the statute of 18th Edw. 1st, enacting that "no feoffment shall be made to assure land in main," is inserted by the revisors of 1820, in their list of British statutes then in force. (See 1 Rev. Code of 1820, p. 87). It may well be doubted whether it ever was so; but if it were, it was certainly repealed when the statutes were revised *Page 268 
in 1836. (See 1 Rev. Stat. ch. 1, sec. 2). There has been no necessity for any such restraints upon corporations by statutory enactments in this country. In England it was otherwise; and the difference in the condition of the two countries with regard to their bodies politic, and the resulting difference in their legislation concerning them, is clearly stated by the Court in a case to which I shall refer more particularly hereafter. "A capacity to purchase and alien land, unless specially restrained by its charter, or by statute, has been held to be an incident, at common law, to every corporation. This general power, it has been found necessary in England to restrain by statute; and there, their powers in this respect are understood to be general and unlimited, except so far as controlled by such statutes. A large proportion of the corporations there hold their corporate rights by prescription. This supposes the grant no where to be found in written form. The uncertainty of the limits of the powers granted, and the great extent of powers claimed, at an early period created a necessity of limiting them by act of parliament. The statutes of Mortmain have this effect, in reference to purchasing and holding lands. In this country, few instances can be found of the existence of corporations, whose charters did not originate in express legislative enactment, and are not to be found printed in the statute books. In these cases, the grant of power is before us. The charter defines the grant, with its restrictions and limitations. Unless some other statute, enacted by the same authority, either general or special, can be found, enlarging or restricting those powers, we look no further for the rights of the body corporate."
This notice, however brief and imperfect it may be, of the English statutes of mortmain, and of the difference, or contrast rather, between them, and our charters of incorporation, is sufficient to show that the principles applicable to the construction of the former, can have very little bearing upon that of the latter. The former were intended for an age, and a condition of society, entirely unlike the political and social institutions of the American States. They were mainly aimed against the *Page 269 
grasping power of the religious houses, in a semi-barbarous state of civilization, and were designed to rescue, from what has been quaintly called their death-clutch, the lands whose feudal services were the chief support and defence of the Kingdom. They fully accomplished their purpose by putting it into the power of the King and other feudal lords to enter upon, and seize, the lands when purchased without license from those whose rights were in danger of being invaded. The King, who, in the course of time, became almost the only person likely to be injured, it is true, could not take advantage of the forfeiture until an inquisition was made, as in the case of lands purchased by an alien. But that was found to be a sufficient protection to his rights; and the result of a commission issued on his behalf in December, 1833, in the case of the "University Life Assurance Society," shows that the power of entry upon office found, though it had its origin in a far different state of society, was still effective for good. See Shelf. on Mort., p. 10, note (e)
Corporations exist in this country, as has already been said, by virtue of express acts of legislation. They are created for a great variety of political and civil purposes, all having in view, or supposed to have in view, the weal of the State in which they have a "local habitation and a name." Their powers, rights and duties are defined, and limited in their several charters of incorporation, and when a question arises as to either rights, powers or duties, we must look to their charters mainly for the answer. The charter of any particular corporation is a law peculiar to itself, and by that law must it be judged. See Ang. and Ames on Corp., sec. 151. This brings us to the consideration of the restrictive clause in the charter of the plaintiffs, upon the proper construction of which our decision must turn.
There cannot be the slightest doubt that the Legislature intended to forbid the plaintiffs from owning, at any one time, real and personal estate, the value of which should exceed the sum of two hundred thousand dollars. Whether the policy of such a restriction was wise or not, I, as a Judge, *Page 270 
have no right to enquire. An examination of the course of legislation from 1833 to the present time will show that it has been a settled policy with the General Assembly to restrain the amount of property held, or to be held, by institutions similar to the one whose case is before us. Thus, in 1833, the act incorporating "A literary and manual school in the county of Wake," declared that the value of its real and personal estate should not exceed fifty thousand dollars. In 1838, the carter granted to "The Trustees of the Greensborough Female College," limited the whole amount of its real and personal estate to the sum of two hundred thousand dollars; the same amount, which, in the same year, was prescribed for the plaintiffs, and for "The Trustees of Wake Forest College." Passing by the "Carolina Female College," and the "Trustees of the Clinton Female Institute," whose capital stock was, in 1848 and 1850, fixed respectively at twenty thousand dollars, and the "Glenn Anna Female Seminary," whose capital stock was, in 1854, limited to twenty-five thousand dollars, we come to the year 1856, when as many as four literary institutions were created, or had their charters amended, with similar restrictions: First, "The Trustees of the Female College of the Methodist Protestant Conference," was chartered, with a clause which restrains the amount of its property to three hundred thousand dollars. Secondly, "The Warrenton Female College," amount restricted to forty thousand dollars. Third, the charter of the plaintiffs amended so as enable them to hold property to the amount of five hundred thousand dollars; and lastly, the capital stock of "Carolina Female College," was increased to one hundred and fifty thousand dollars. It is true that during this period many academies and other literary institutions, were chartered without any such restrictive clauses. Why this was done, we need not enquire. The restrictions imposed upon those to which we have referred, indicate that the Legislature had a policy upon the subject, though it may not have acted uniformly upon it. The effect of that policy was to make it unlawful for the institutions which we have named, to own *Page 271 
real and personal estate exceeding in value the amount specified for each respectively. What other construction can be put upon the words, "the whole amount of real and personal estate belonging to said corporation shall not, at any one time, exceed in value the sum of two hundred thousand dollars?" It seems to me, that, in admitting that the State, upon office found, or otherwise, may seize and take to its own use, the excess, the plaintiffs' counsel virtually admit that it is unlawfully held by the college. Why so forfeited to the State unless because the college has it in opposition to the express prohibition of its charter? If unlawful for the plaintiffs to have it, can a court of equity assist them to get it? I have, in vain, tried to discover a principle upon which the claim of the plaintiffs can be supported. The analogies of the common law are against it. It is well settled, and well known, that a contract, the consideration of which induces to the doing of an act, either malum in se, or malum prohibitum, is void, and no action at law can be sustained upon it. See Ingram v. Ingram, 4 Jones' Rep. 188, and the cases therein referred to. Will the court of equity be less sensitive to the duty of upholding the law, or less alive to the importance of preventing its violation? I have studied its principles to little purpose if it be so. I can find no case sustaining such a doctrine. On the contrary, I have found a very instructive one decided in the courts of one of our sister states, which fully sustains what I believe to be the true principle applicable to the present case. It is the case ofThe President, Directors and Company of the Bank of Michigan v. Niles, 1 Doug. (Mich.) Rep. 401. It was a bill filed by the plaintiffs, for the purpose of obtaining the specific performance of a contract entered into between them and the defendant, whereby the plaintiffs bound themselves, within a certain specified time, to convey to the defendant certain real estate described in the contract, and to obtain from one J. H. P. a good and sufficient deed for the property called the Rochester-mill property, and to convey to the defendant three undivided fourth parts of it; and, in case a mortgage or incumbrance should be created for the *Page 272 
purchase of the mill property, they covenanted to pay the same, and have it released within five years from the date of the contract; and they further agreed to deliver to the defendant certain certificates signed by him. The defendant, on his part, agreed to execute a mortgage to the complainants for the purchase-money to be paid by him, amounting to $28,000, and, in addition, to include in the securities, certain notes, and the amount of the above mentioned certificates. The mortgage was to be executed on the property conveyed to him, and upon the remaining interest, which he already possessed in it as tenant in common. Within the specified time, the plaintiffs purchased the mill property; and then prepared and executed to the defendant a deed for three fourths of it, together with the other property which they were bound by the contract to convey to him, and were ready and willing to perform their part of the contract. The defendant demurred, and the demurrer having been sustained by the Chancellor, the plaintiffs appealed to the Supreme Court. The question turned upon the construction of the 3rd and 9th sections of the plaintiffs' charter of incorporation. The 3rd section provided that they "shall be in law capable of purchasing, holding and conveying estate, real and personal, for the use the said corporation." The 9th section enacted "That the lands, tenements and hereditaments, which it shall be lawful for the said corporation to hold, shall be only such as shall be required for its accommodation, in relation to the convenient transaction of its business, or such as shall have been bona fide mortgaged to it by way of security, or conveyed to it in satisfaction of debts previously contracted in the course of its dealings, or purchased at sales, upon judgments which shall have been obtained for such debts."
Upon the argument, the defendant, in support of his demurrer, contended that the plaintiffs were not authorized by their charter to make such a contract as that stated in their bill; that the buying and selling of real estate, except in the cases specified in their charter, was not within the scope of their corporate powers, and was, therefore, unlawful; and that the *Page 273 
Court of Equity would not lend its aid to enforce a contract made in violation of law.
The counsel for the plaintiffs argued against the demurrer, that the general power to purchase and convey real estate, given by the 3rd section of their charter, was not affected or limited by the provisions of the 9th; that the latter used only the word "hold;" and they contended that the only design of the provision was to prevent real estate from being locked up in mortmain, in the hands of the corporation, and that the buying and selling of lands by it was not unlawful.
The Court, in an able opinion delivered by FELCH, Judge, decided that, by the terms of their charter, the plaintiffs were not authorized to make a business of buying and selling real estate; and that the contract made with the defendant was, therefore, unlawful. In concluding their opinion, the Court say, "there may be a difficulty, in cases where contracts are made in reference to matters but remotely tainted with immorality or illegality, and not the immediate subject of the undertaking of parties, to determine in what instances the principle should be applied; but when the very act contracted to be done is itself illegal, there can be no doubt of the application of the principle."
"The Bank of Michigan contracted to obtain and convey a title to real estate, under circumstances which made it a transaction prohibited by the spirit and terms of its charter. The defendant, with knowledge of the unlawfulness of the transaction, (for the charter is declared to be a public act), entered into the contract. Each party to the contract put himself in the power of the other; and as the Court of Equity would not interfere to compel the bank to perform its agreement, by buying and selling lands in violation of the law, so aid cannot be afforded to the bank to compel the defendant to perform on his part."
The principle deducible from the case to which I have just referred is the true principle by which the action of the Court of Equity should always be guided. Whether in matters of contract, or in any other matters in which human action is *Page 274 
concerned, it should ever be ready to enforce that which the law commands, and to prevent that which the law forbids. It would be untrue to its high duty, if it, in any case or under any circumstances, lent its aid to any person, individual or corporation, who was seeking, with however innocent an intent, to circumvent the law. Governed by this spirit, it cannot assist the present plaintiffs. The lawgiver says, in the plainest terms, that they shall not own (for what belongs to them, they must own), more in value of real and personal estate than $200,000. It is against the law, then, for them to have it, and yet they ask this Court to give it to them. The Court cannot do so without assisting them to violate the law, and, therefore, it cannot do so at all.
The case of Humbert v. Trinity Church, 24 Wend. (N. Y.) Rep. 587, and that class of cases, wherein it has been held, that an increase of income, above the limit prescribed in the charter, from property already held by the corporation, is not against law, do not militate against this principle. In such cases the corporation has no necessity to ask the aid of any court to enable it to get the property. The original owner had, long before, parted with his title to it, when to purchase it was not forbidden to the corporation, and when the value of the property rises above the chartered limit, the only question with respect to it, which can arise, must be between the corporation and the State.
It only remains for me to say, that if I have been successful in showing that when the testator died it was unlawful for the plaintiffs to have the excess of the legacy above what was necessary to make the value of their real and personal estate amount to $200,000, it follows as a necessary consequence that, as to such excess, the legacy was void, and in the absence of a residuary legatee to take it, it resulted to the next of kin.
The cases referred to by my brother PEARSON, clearly show this, and it is unnecessary for me to add any thing to what he has said upon that subject. He has shown also that, in the view which we have taken of the case, the act of the last General Assembly, (see Acts of 1856, ch. 94), has no operation *Page 275 
upon it. The 3rd section of that act provides as follows: "That all right, title and interest on the part of the State of North Carolina, and the University of North Carolina, or either of them, if any they have, in and to the estate and officers (?) given, or attempted to be given, in the last will and testament of Maxwell Chambers, late of Salisbury, to the Trustees of Davidson College be, and the same is hereby, released and conveyed to the Trustees of Davidson College, for the purpose specified in the said will." The section does not profess to give the legacy, or that part of it which may have previously become vested in interest, in the next of kin; and it is certain that the preceding section, which enlarges the amount of property the Trustees of the College should be authorized in future to hold, did not, and was not intended to, have that effect.
The novelty and importance of the question, and the large amount of property involved in the suit, must be my apology for stating the reasons for my opinion at such length.